**Affirmed and Memorandum Opinion filed December 3, 2020.**



**In the**

# Fourteenth Court of Appeals

### NO. 14-20-00492-CV

## IN THE INTEREST OF A.W., A.W., AND A.W., CHILDREN

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2019-00537J**

## MEMORANDUM OPINION

The issues in this case involve whether the trial court's findings to terminate a mother's parental rights are supported by legally- and factually-sufficient evidence. This accelerated appeal arises from a final order in which, after a final hearing tried to the bench,[1] the trial court terminated the parental rights of appellant W.C. (Mother) with respect to her sons A.W. (Arthur), A.W. (Tony), and A.W. (Will),[2] and appointed appellee Department of Family and Protective Services (the

---

[1] We refer to the final hearing as the "trial."

[2] To protect the minors' identities, we have not used the actual names of the children, parents, or other family members. *See* Tex. R. App. P. 9.8. At the time of trial, Arthur and Tony were each seven-years old, and Will was five-years old.

Department) to be the children's sole managing conservator.[3] *See* Tex. Fam. Code Ann. § 109.002(a-1); Tex. R. App. P. 28.4 (accelerated appeals in parental-termination cases).

In her first, second, and third issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings in its final order on the predicate grounds of (1) endangerment, (2) constructive abandonment, and (3) failure to comply with the court-ordered family-service plan.[4] Tex. Fam. Code Ann. § 161.001(b)(1)(E), (N), (O). In her fourth issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children. *Id.* § 161.001(b)(2). We affirm.

## I. BACKGROUND

The children were removed to the Department's temporary managing conservatorship in February 2019. Trial on the Department's petition to terminate Mother's parental rights was held in June 2020 via videoconferencing because of the COVID-19 pandemic. At time of trial, Mother was in a rehabilitation center in Memphis, Tennessee, and did not testify.

## A. Documentary evidence

### 1. Family-service plan

According to the Department's family-service plan, which was admitted into evidence at trial, the children were removed after the Department received a

---

[3] The trial court also terminated the parental rights of the children's alleged and unknown fathers, who did not appear at trial and are not parties to this appeal.

[4] While Mother did not file a motion for new trial, "[i]n a nonjury case, a complaint regarding the legal or factual insufficiency of the evidence . . . may be made for the first time on appeal in the complaining party's brief." Tex. R. App. P. 33.1(d). We further note that, while Mother filed her notice of appeal before the trial court signed its final order, "[i]n a civil case, a prematurely filed notice of appeal is effective and deemed filed on the day of, but after, the event that begins the period for perfecting the appeal." Tex. R. App. P. 27.1(a).

referral alleging neglectful supervision of the children by Mother in January 2019. The referral mentioned Mother's mental health and the condition of the home where she lived with the children, and stated that Mother was lying on the couch in the home, her speech was slurred, and she appeared to be incoherent. According to the officer investigating the home, there were clothes and trash around the home, the home smelled unclean, and "the home environment was very hazardous for the children."[5]

After removal, the Department prepared a family-service plan for Mother. The stated goals of the plan were that Mother address her mental-health issues, provide safe housing and food for the children, maintain a substance-free lifestyle, and demonstrate knowledge of techniques for maintaining a stable home for the children. The service plan required Mother to: complete psychiatric and psychological evaluations and a substance-abuse assessment; make her best effort to attend all scheduled court hearings, permanency meetings, and family visits; maintain contact with her caseworker and otherwise cooperate with the Department; and submit to random drug screenings. The family-service plan was approved and incorporated by order of the trial court.

## 2. Drug-screening records

Records from the National Screening Center show that Mother appeared for a drug-and-alcohol screen in October 2019 but left before providing a sample, which the National Screening Center classified as a "REFUSAL/POSITIVE TEST." *See also In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th

---

[5] The Department's removal affidavit was not admitted into evidence at trial and we do not discuss any allegations from that affidavit in this opinion. The issue of whether the Department presented sufficient evidence to warrant removal is not before the court, and the court offers no opinion as to whether the evidence concerning removal summarized in this opinion from evidence admitted at trial was sufficient to support removal.

Dist.] 2009, no pet.) ("A factfinder reasonably could infer that [mother]'s failure to submit to the court-ordered drug screening indicated she was avoiding testing because she was using drugs.").

### 3. Criminal history

Also admitted was a judgment of conviction from the 230th District Court of Harris County that Mother was guilty of the class-A misdemeanor offense of assault of a family member occurring in March 2016. The judgment reflects Mother's sentence was initially suspended and she was placed on two-years community supervision. In April 2018, the criminal court found Mother to have violated the terms and conditions of her community supervision "**BY FAILING TO AVOID INJURIOUS AND VICIOUS HABITS**," revoked the suspended sentence, and sentenced Mother to 300-days incarceration.

### 4. Permanency report

The Department's permanency report prepared the month of trial was also admitted into evidence. According to the report, Child Protective Services (CPS) made a follow-up visit to Mother's home days after the initial referral. Mother's home had no working utilities and there was food on the counters that appeared to have been there for several days and was beginning to rot and mold. The sink was full of dirty dishes and there was no food in the refrigerator. The home was cluttered and filled with dirty clothes and had a bad odor.

A visit was made to the home of Mother's mother (Grandmother) the same day. Although the children had been temporarily residing with Grandmother, Grandmother stated Mother had forced her way into Grandmother's home and taken the children. During the visit, Mother arrived in her car with the children, who were not wearing seat belts or other restraints. Mother admitted to using

illegal substances, but did not provide specifics. Before the visit, Grandmother called CPS to report that Mother had been found outside of her home nude and had been taken into custody and transported to a branch of Memorial Hermann hospital before being released.

At the time of trial in June 2020, the children were in the same foster home, where they had been since August 2019. This was their third placement since removal; they were removed from their first placement due to allegations of corporal punishment and from their second placement due to neglect.

The report noted that Mother missed more than half of her scheduled visits with the children and did not complete other services specified in the service plan. Specifically, Mother had not been able to maintain stable housing or employment. She did not attend the initial permanency hearing. Although Mother had completed psychological and substance-abuse assessments, she had not followed the recommendations stemming from those assessments, including that she seek assistance and treatment for bipolar disorder and engage in outpatient therapy and counseling, parenting-skills training, and random urinalysis screening. In July 2019, Mother had her blood drawn at the hospital and tested positive for amphetamines. She admitted she had taken Xanax and PCP in September 2019. Her November 2019 Department drug screen was positive for opiates.

The month before trial, Mother told her caseworker she had stopped attempting to complete her services because she thought it was too late. Mother also told her caseworker that she had spoken to her brother (Uncle) about obtaining custody of the children so he could return them to her. She was participating in a substance-abuse program through a nonprofit ministry in Memphis, Tennessee, a nine-month program she started shortly before trial.

## 5. CASA report

The report by court-appointed special advocate (CASA) Child Advocates, Inc., filed the month of trial, was also admitted into evidence. The report recommended that the parental rights of Mother and the children's unknown fathers be terminated.

The report stated that Arthur, then seven-years old, had been diagnosed with attention deficit hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), encopresis, enuresis, and disruptive mood dysregulation disorder (DMDD). He was hospitalized in March 2019 due to behavioral issues. He struggled with low frustration tolerance and poor focus and would sometimes hit his foster brother during horseplay. Although he had issues with defiance, these behaviors were helped by redirection.

Tony, then seven-years old, had been diagnosed with ADHD, ODD, and DMDD. He would get into fights in school and sometimes run away from school. The foster mother thought he was regressing and stated that she had to constantly redirect him, that he made poor decisions, and had trouble managing his behavior.

Will, then five-years old, had been diagnosed with ODD, adjustment disorder, and child neglect. He had nightmares and issues with disruptive behavior. He was not toilet trained and fought with his brother daily.

Regarding Mother, the report states that at her psychological evaluation, she was diagnosed with bipolar disorder, child neglect, and suspected substance abuse. She was first diagnosed with bipolar disorder in 2015. She stated she was receiving mental-health services from the county and taking medication, but the medication did not always work.

The report states that the children appeared well cared for by their current

caregiver, and there had been improvements in their behavior and hygiene, although they constantly fought and argued with each other. The caregiver provided them with a stable home and structure and was meeting their needs. The children were receiving consistent mental-health evaluations and were prescribed medication as necessary.

## B.    Trial testimony

### 1.    Caseworker

CPS caseworker R. Coleman testified that the children were removed based on allegations of abuse or neglect. Specifically, there were allegations of neglectful supervision with later confirmed use of illegal drugs, including opiates and PCP, by Mother. Coleman stated that when in Mother's care, the children had been allowed to do anything they wanted, which Coleman attributed to Mother being unable to parent the children due to her drug use. In addition, the home where Mother had been living with the children before their removal had no running water or other utilities.

After removal, Mother told Coleman that she used illegal drugs in September 2019 and May 2020 (the month before trial). During the 18 months before trial, Mother had attempted substance-abuse rehabilitation several times, including one attempt in October 2019 from which Mother was discharged without completing the rehabilitation program. Coleman understood Mother was doing well in the rehabilitation facility in Memphis, Tennessee, where Mother was at time of trial.

Coleman also testified that Mother had not maintained significant contact with the children during the case and had missed many scheduled biweekly family visits with the children. Although she had a visit with the children two days before

trial in June 2020, before that she had not seen the children since September 2019, more than eight months earlier. Although she had been ordered to give 24-hours notice if she was going to miss a visit, she had not done so. Overall, she attended less than half of the scheduled visits with her children. Mother behaved appropriately during the visits she attended and displayed affection for the children. The children displayed affection "minimally" for Mother and were familiar with her.

Coleman also detailed Mother's progress regarding the requirements of the family-service plan, testifying that Mother completed substance-abuse and psychological assessments, but had not followed the recommendations stemming from either. She did not consistently complete required drug testing and, although diagnosed with bipolar disorder, did not take steps to address her mental health over the course of the case. She had not shown an ability to provide stable housing, employment, or income. Mother participated in court hearings and permanency conferences with the exception of one court hearing.

Coleman testified that the children's foster placement was "going very well" and "meeting all of their needs," including needs related to medical and psychological issues. The children's behaviors and conditions had improved significantly since being in the Department's custody. When the children entered custody, they were very angry and aggressive, including attacking or ignoring one another, though Coleman admitted those behaviors could have been due to separation from Mother. Over time, their behavior improved, and they were being polite and playing with each other. In addition, Arthur's depression had improved. According to Coleman, the children were "completely different people" from when they had entered care and had made a great deal of progress.

The children's placement was not an adoptive placement, although the

children were welcome to stay long-term. The Department's goal was unrelated adoption with the concurrent goal of relative adoption. The Department had no specific adoption plan for the children at time of trial. While the Department had explored the possibility of Uncle taking custody of the children, Mother had told Coleman that she hoped that Uncle would take custody of the children and then return them to her.

### 2. CASA

Sandra Nassif of Child Advocates, Inc. requested termination of Mother's parental rights because Mother had not been able to provide a stable home for the children or complete her drug treatment. She testified that the children's foster mother was doing "a great job."

### 3. Director of rehabilitation facility

Jennifer Saluki, executive director of the women's home and Christian ministry in Memphis where Mother was at time of trial, testified that Mother had been at the facility since May 2020. Saluki testified that, while Mother had difficulty when she first arrived at the facility, at trial she was doing "real well." The facility gives random drug tests and provides mental-health services.

### 4. Uncle

Uncle testified that Mother never asked him to obtain custody of the children in order to return them to her. He testified that he wanted to adopt the children and that Mother should not have immediate visitation so that the children could adjust to living with him.

## II. ANALYSIS

In her first, second, and third issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings on the predicate

grounds of (1) endangerment, (2) constructive abandonment, and (3) failure to comply with the court-ordered family-service plan. Tex. Fam. Code Ann. § 161.001(b)(1)(E), (N), (O). In her fourth issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children. *Id.* § 161.001(b)(2).

## A.    Standards of review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."). Given the fundamental liberty interests at stake, "termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20.

Due to the severity and permanency of terminating the parental relationship, the law in Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *see In re J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *See In re J.F.C.*, 96 S.W.3d at 266. We review the legal sufficiency of the evidence by considering all evidence in the light most favorable

to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* However, this does not compel us to disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (internal quotation marks omitted). We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

## B. Predicate termination grounds

The trial court made predicate termination findings that Mother had committed acts establishing the grounds set forth in subsections E, N, and O of section 161.001(b)(1), which provides for termination of parental rights if the factfinder finds by clear and convincing evidence that the parent has:

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

11

. . .

(N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:

> (i) the department has made reasonable efforts to return the child to the parent;

> (ii) the parent has not regularly visited or maintained significant contact with the child; and

> (iii) the parent has demonstrated an inability to provide the child with a safe environment; [or]

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(E), (N), (O).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest. *See id.* § 161.001(b)(1); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Due process requires, however, that when a parent has challenged the sufficiency of the evidence to support endangerment findings under Family Code section 161.001(b)(1)(D) or (E), an appellate court must address those findings to ensure a meaningful appeal due to the collateral consequences of a finding under those subsections. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019).

### 1.    Endangerment under subsection E

In her first issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that she endangered the children under subsection E. Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to

expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A finding of endangerment under subsection E requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A trial court properly may consider actions and inactions occurring both before and after a child's birth and before and after removal to establish a course of conduct. *Id.* at 360–61. "While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone." *Id.* at 360 (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *Id.*

We begin with evidence of family violence by Mother. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Mother was convicted of the misdemeanor offense of assault of a family member occurring in 2016, when the children were each under five years of age, and sentenced to 300-days incarceration by "failing to avoid injurious and vicious habits" in 2018, when the children were still very young. *See Boyd*, 727 S.W.2d at 533–34 (criminal violations and incarceration can be evidence of

endangerment if shown to be part of course of conduct endangering child).[6]

There is additional evidence of Mother's absence from the children's lives. After removal, Mother did not participate in scheduled biweekly family visits for more than eight months before trial, with the exception of one virtual visit with the children two days before trial. *See In re R.M.*, No. 07-12-00412-CV, 2012 WL 6163100, at *4 (Tex. App.—Amarillo Dec. 11, 2012, no pet.) (mem. op.) (parent's inconsistent participation in visitation can endanger child's emotional well-being); *In re S.I.H.*, No. 02-11-00489-CV, 2012 WL 858643, at *6 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op.) ("[Father's] failure to attempt to visit [child] for several months during the pendency of this case supports the trial court's finding of endangerment of [child's] emotional well-being[.]").

When Mother was in the children's lives, there is evidence that Mother did not provide appropriate care and stability for them. According to Coleman's testimony and the Department's permanency report admitted at trial, at the time of removal, the residence where Mother was living with the children had no working utilities, no food in the refrigerator, and rotting food on the counters. "While poverty should not be a basis for termination of parental rights, a parent's inability to provide basic utilities in the family home may constitute evidence of endangerment of the children's well-being." *In re H.D.M.*, No. 09-18-00050-CV, 2018 WL 2974461, at *7 (Tex. App.—Beaumont June 14, 2018, pet. denied) (mem. op.) (citing *Doria v. Tex. Dep't of Human Res.*, 747 S.W.2d 953, 958 (Tex. App.—Corpus Christi 1988, no writ) (explaining that parent leaving children in home without electricity, water, or heat was "compelling evidence" of child endangerment)).

---

[6] There was also evidence that, in the days following the referral and initiation of CPS's investigation, Mother forced her way into Grandmother's home and took the children, who had been allowed to stay temporarily with Grandmother.

14

In addition, given Coleman's testimony that Mother's use of illegal drugs prevented her from effectively parenting the children while they were in her care, a reasonable factfinder could have concluded that Mother's use of illegal drugs contributed to her endangering course of conduct. *See In re J.O.A.*, 283 S.W.3d at 345 (effect of drug abuse on ability to parent can be evidence of endangering course of conduct). While evidence of drug use on its own is not sufficient to support a finding of endangerment, evidence of drug use is relevant when it is causally connected to conduct endangering the children. *See In re L.C.L.*, 599 S.W.3d 79, 84 (Tex. App.—Houston [14th Dist.] 2020, pet. filed) (en banc). Further, while "[m]ental illness alone is not grounds for terminating the parent-child relationship, . . . [u]ntreated mental illness can expose a child to endangerment, however, and is a factor the court may consider." *In re S.R.*, 452 S.W.3d at 363. Here, the evidence shows that Mother had been diagnosed with bipolar disorder, among other mental-health issues, but had not sought treatment on a consistent basis to address these issues as required by the family-service plan. *See id.*

We conclude that the evidence of Mother's family violence, absence from the children's lives both before and after removal, and inability to provide a stable home and appropriate care for the children, including inability to care for the children due to her drug use and untreated mental-health issues, would allow the factfinder to form a firm belief or conviction that Mother engaged in a course of conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Accordingly, the evidence is legally and factually sufficient to support termination of parental rights under predicate ground E. *See id.*

In light of this conclusion, we need not address the trial court's findings on

subsections N and O. Tex. R. App. P. 47.1; *In re A.V.*, 113 S.W.3d at 362. We overrule Mother's first three issues.

## C. Best interest of the child

### 1. Legal standard

In her fourth issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(2). There is a strong presumption that the best interest of the children is served by keeping the children with their natural parents. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). However, prompt and permanent placement of the children in a safe environment is also presumed to be in the children's best interest. *In re S.R.*, 452 S.W.3d at 366 (citing Tex. Fam. Code Ann. § 263.307(a)). Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of the children's best interest. *See id.* The considerations that the factfinder may use to determine the best interest of the children, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future physical and emotional danger to the child;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the children;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing

parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (interpreting former Tex. Fam. Code § 15.02 (since amended)); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any unique set of factors or limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

## 2. Sufficiency of the evidence

The children did not testify at trial and accordingly did not express their desires as to placement or termination of Mother's parental rights. *See Holley*, 544 S.W.2d at 371–72. Regarding their current placement, it was not an adoptive placement. While there was evidence that the children were improving in their placement, there was also evidence that the children continued to suffer from psychological and behavioral issues, and that while in the Department's custody they had been removed from two prior placements due to abuse or neglect by the caregivers.

Regarding the children's present and future physical and emotional needs, present and future physical and emotional danger to them, and Mother's acts and omissions, when evaluating these factors "we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs." *In re D.R.A.*, 374 S.W.3d at 533. Establishing a stable, permanent home for a child is a compelling government interest. *Id.*

As discussed above regarding endangerment, the evidence shows that Mother was not able to provide a stable home for the children before removal, as the residence where they were living did not have working utilities and had rotting

food on the counters and no food in the refrigerator. Likewise, there was evidence that Mother's drug use before removal, which continued after removal, and her untreated mental-health issues adversely affected her ability to care for the children. After removal, Mother did not show that she was able to maintain stable housing or employment, and with one exception she did not visit the children for more than eight months before trial. *See In re S.R.*, 452 S.W.3d at 366 (evidence of endangerment is relevant to child's best interest).

In addition, Mother's continued use of illegal drugs after the children were removed violated the family-service plan. Further, while there was evidence that Mother had received some mental-health services during the pendency of the proceedings and was at a facility offering drug-testing and mental-health services at time of trial, there was also evidence that Mother had not consistently participated in drug testing or followed recommendations for mental-health treatment as required by the service plan. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with [the] family service plan support a finding that termination is in the best interest of the child."); *see also In re S.R.*, 452 S.W.3d at 363 (while mental illness is not ground for termination, court may consider effect of untreated mental illness on children's well-being). Mother did not testify at trial to offer any excuse for her acts or omissions. *See Holley*, 544 S.W.2d at 371–72.

Our review of the *Holley* factors shows that Mother was unable to provide a stable home for the children before removal and had not demonstrated behaviors, such as maintaining stable income and employment, consistently addressing her substance-abuse and mental-health issues, or maintaining regular contact with her children, that would indicate she would be able to do so in the future. *See In re*

18

*S.R.*, 452 S.W.3d at 368 ("The factfinder reasonably could have concluded the Father's lack of stability supported the finding that termination is in the Children's best interest."). We conclude that the trial court's finding by clear and convincing evidence that termination of Mother's parental rights is in the children's best interest is supported by legally- and factually-sufficient evidence. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Holley*, 544 S.W.2d at 371–72. We overrule Mother's fourth issue.

## III.  CONCLUSION

We affirm the trial court's final order as challenged on appeal.

/s/     Charles A. Spain
Justice

Panel consists of Justices Spain, Hassan, and Poissant.